UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FILED
U.S. DISTRICT COURT

S. KELLI ANDERSON, KEITH EDWARDS,
DESHAWN GIBSON, DEE IBRAHIM,
CINDY KOONCE, BRYANT MOORE,
WILLIAM OLIPHANT, PEARL OLIPHANT,
ELIJAH WILLIAMS, WANDA LOVING,
NATASHA McCALL, JORGE LAO,
CHARLES MOORE and BURTHON LYNCH,

S.D. OF N.Y. W.P.

Plaintiffs,

**COMPLAINT**

vs.

**'04 CIV 9719**

VOLUNTEERS OF AMERICA, INC.

**ROBINSON**

Defendants.

-------------------------------------------------------x

Plaintiffs S. Kelli Anderson, Keith Edwards, Deshawn Gibson, Dee Ibrahim,

Cindy Koonce, Bryant Moore, William Oliphant, Pearl Oliphant, Elijah Williams, Wanda

Loving, Natasha McCall, Jorge Lao, Charles Moore and Burthon Lynch, by and through

their counsel, Michael H. Sussman, hereby complain of defendant as follows:

I. **JURISDICTION**

1. Plaintiffs, current and former employees of Volunteers of America [hereinafter

"VOA"] at Camp LaGuardia in the State of New York, County of Orange, allege that

they were subjected to inferior terms and conditions of employment and, in many cases,

terminated from employment on the basis of their race and/or national origin in violation

of 42 U.S.C. sec. 1981-a, as amended. This Court has subject matter jurisdiction pursuant

to 28 U.S.C. secs. 1331, 1343 © and (d) and 42 U.S.C. sec. 1981 and 1988.  This Court


USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:

1☐☐☐☐☐☐1251

also has subject matter jurisdiction over the supplemental state claims pursuant to 28 U.S.C. sec. 1367.

## II. **PARTIES**

2.  Plaintiffs are African-Americans with the exception of Jorge Lao, who is of Puerto Rican descent and national origin.

3. Plaintiff S. Kelli Anderson is a resident of the State of New York, City of Newburgh, within this judicial district.

4. Plaintiff Keith Edwards is a resident of the State of New York, Town of Fishkill, within this judicial district.

5. Plaintiff Deshawn Gibson is a resident of the State of New York, City of Middletown, within this judicial district.

6. Plaintiff Dee Ibrahim is a resident of the State of New York, Village of Warwick, within this judicial district.

7. Plaintiff Cindy Koonce is a resident of the State of New York, City of Newburgh, within this judicial district.

8 Plaintiff Bryant Moore is a resident of the State of New York, City of Middletown, within this judicial district.

9. Plaintiffs William and Pearl Oliphant are residents of the State of New York, Town of Florida, within this judicial district.

10. Plaintiff Elijah Williams is a resident of the State of New York, City of Newburgh, within this judicial district.

11.  Plaintiff Wanda Loving is a resident of the State of New York, City of Newburgh, within this judicial district.

12.  Plaintiff Natasha McCall is a resident of the State of New York, County of Orange, within this judicial district.

13.  Plaintiff Jorge Lao is a resident of the State of New York, City of Middletown, within this judicial district.

14.  Plaintiff Charles Moore is a resident of the State of New York, City of Middletown, within this judicial district.

15.  Plaintiff Burthon Lynch is a resident of the State of New York, City of New York, within this judicial district.

16.  Each of the fourteen plaintiffs is of legal age and is competent to sue and be sued.

17.  Defendant VOA, Inc. is a national, not-for-profit organization with its main regional office in the State of New York, City of New York, within this judicial district.

18.  VOA operates Camp LaGuardia, which is located in Orange County, New York, under a contractual arrangement with the City of New York, which provides it and its agents with decisional authority over hiring and firing.

19.  Defendant VOA may sue and be sued in this district.

III. **FACTUAL AVERMENTS**

**a)  Anderson**

20. Plaintiff Anderson worked for defendant from July 2002 until September 2003 as a team member in Camp LaGuardia's intake and assessment division.

21.  Plaintiff Anderson was responsible for overseeing 81 residents' beds, an extraordinary caseload for someone at her level of responsibility.

22. Plaintiff Anderson received favorable evaluations from her supervisor throughout her employment at Camp LaGuardia.

23. After commencing her employment, plaintiff Anderson was not permitted to apply for, nor was she promoted to, the position of client care worker.

24. In August 2003, plaintiff Anderson's physician ordered her to go on maternity leave and remain in bed, opining that she would be able to return to work on November 12, 2003.

25. Plaintiff Anderson was terminated on September 22, 2003, while on maternity leave, without good or sufficient cause and on the basis of her race, while a pregnant Caucasian employee, Gretchen Hedges, retained her job when she returned from maternity leave.

**b) Edwards**

26. Defendant employed plaintiff Edwards for ten years, starting in 1993. Between 1999 and 2003, plaintiff Edwards worked at Camp LaGuardia, lastly as a team leader.

27. During the shift he worked, plaintiff Edwards was the senior administrator.

28. Plaintiff Edwards received uniformly positive performance evaluations.

29. In June 2002, defendant denied plaintiff Edwards a promotion to the position of team leader in favor of Charles Bordino, a less well qualified Caucasian.

30. Late in 2002, plaintiff Edwards' superiors, VOA Associate Director of Operations Brian Bardell [hereinafter "Bardell"] and Program Director Jeffrey Brain [hereinafter "Brain"], asked Edwards to hire Skip Robokoff [hereinafter "Robokoff"], an unqualified white male, as an intake specialist.

31. In or about March 2003, plaintiff Edwards reviewed and signed the intake paperwork admitting into Camp LaGuardia a client who, it was later discovered, suffered from tuberculosis.

32. Potential clients at Camp LaGuardia are subject to a medical examination by the Department of Homeless Services in New York City before assignment to any shelter. The assistant team leader does not accept or reject clients, but rather, after a decision has been made to accept a client, reviews and signs intake papers.

33. Plaintiff Edwards had no formal medical training and could not reasonably be expected to recognize the early symptoms of TB; nor was he tasked with evaluating a client's medical condition.

34. The client admitted with TB died on June 25, 2003.

35. In August 2003, plaintiff Edwards was advised that he needed to re-apply for his position.

36. Human Resources Manager Kelly Ashley [hereinafter "Ashley"], Program Director Brain and Associate Director Casey Simpson [hereinafter "Simpson"] interviewed plaintiff Edwards.

37. On September 22, 2003, plaintiff Edwards was told that the patient admitted with TB had died.

38. In mid-September, Brain terminated Edwards, purportedly on account of the TB incident.

39. Plaintiff Edwards was replaced by Robokoff.

**c) Deshawn Gibson**

40. Plaintiff Gibson was employed by VOA from June 24, 2002, to December 15, 2003.

41. Plaintiff Gibson was the supervisor of the transportation department.

42. During the company Christmas party in December 2003, plaintiff Gibson was falsely accused of lying and participating in an exchange of illegal narcotics with a subordinate, driver Christopher Holmes.

43. Plaintiff Gibson was actually handing Holmes a set of car keys when a plastic bag filled with mints fell out of Gibson's pocket.

44. Plaintiff Gibson was terminated based on a videotape showing the incident as well as upon the allegation that his employer had two witnesses who claimed to have seen Gibson drop a square bag containing a "powdery" substance.

45. Previously, plaintiff Gibson had been positively cited for cutting the costs of the transportation department.

46. Plaintiff Gibson's termination was based on VOA's discriminatory attitude towards African-American employees, which manifested by and through the absence of due diligence in this investigation and the racial stereotyping of Gibson and Holmes by the then-President of VOA.

**d) Ibrahim**

47. Between March 2001 and September 2003, defendant employed plaintiff Ibrahim as a team member.

48. Plaintiff Ibrahim assumed the workload of a higher position, case manager, and was responsible for between 40 and 50 clients at a time.

49. Plaintiff Ibrahim has a Bachelor's degree in social work and was well-qualified for her position.

50. Monica Bratton [hereinafter "Bratton"], plaintiff Ibrahim's supervisor, used profanity when speaking to Ibrahim and developed a poor working relationship with her.

51. Bratton had plaintiff Ibrahim transferred to another building, where Ibrahim received favorable performance evaluations.

52. Within the last three years, plaintiff Ibrahim applied for a position with the housing department at Camp LaGuardia.  She was not granted an interview.  She then applied for promotion to the position of case manager.  She was denied this position, to which defendant appointed Buckner, a less-qualified Caucasian female.

53. Brain and Assistant Program Director Lynn Dyroff [hereinafter "Dyroff"] did not interview plaintiff Ibrahim for the housing position.

54. In August 2003, plaintiff Ibrahim was not made aware that a client had contracted tuberculosis.

55. As soon as plaintiff Ibrahim noticed that the client had lost weight and began to appear unhealthy, she encouraged him to seek medical attention.

56. Plaintiff Ibrahim has no formal medical training and could not recognize symptoms for tuberculosis.

57. On September 21, 2003, Brain complimented plaintiff Ibrahim on her conduct during the TB scare.

58. The following day, on September 22, 2003, Brain and Dyroff terminated plaintiff Ibrahim for failing to notify a supervisor that her client had TB, a fact she did not know at the material time.

59. In fact, this termination manifested racial discrimination and disparate treatment.

**e) Koonce**

60. Plaintiff Koonce was employed as a Shelter Care Information Managing Systems (SCIMS) operator between August 2000 and January 2004.

61. Plaintiff Koonce was hired because she was trained in computer usage.

62. Isaiah Roberts [hereinafter "Roberts"], plaintiff Koonce's immediate supervisor, gave her positive performance evaluations.

63. Camp LaGuardia administrators pressured Roberts to lower plaintiff Koonce's evaluation from a 3.0 to a 2.2.

64. During the fall of 2003, defendant Brain initiated a reorganization plan whereby employees were required to apply for positions they already held.

65. During the reorganization, plaintiff Koonce inquired about applying for a position as a supervisor in SCIMS.

66. Associate Director Simpson told plaintiff Koonce that she would lose her current position if she applied for, and did receive, a promotion.

67. Plaintiff Koonce trained Tracey Johnson [hereinafter "Johnson"], a white female, in computer systems.

68. VOA administrators gave Johnson, who did not meet the requisites for the position, the job of supervisor in SCIMS in September 2003. Johnson was terminated in November 2004 after fellow employees complained that she had neither a high school diploma nor a GED.

69. Roberts, who formerly occupied Johnson's shift, was transferred to a less-visible shift.

70. In or around September 2003, VOA administrators implemented a new discriminatory practice: assigning African-American employees to shifts where they would be less visible.

71. Plaintiff Koonce applied for the position she already held and was placed on the customary ninety-day probation.

72. Plaintiff Koonce had an arrangement with Johnson whereby she was permitted to arrive at work a half an hour late (8:30 A.M.) and remain at work a half an hour later than usual (4:30 P.M.).

73. On December 16, 2003, Brain and Simpson warned plaintiff Koonce that her arrival time was "tardy" and unacceptable.

74. Plaintiff Koonce explained that her supervisor had agreed to this schedule.

75. In Johnson's presence, Brain and Simpson then warned plaintiff Koonce not to come in to work late under any circumstances.

76. On or around December 16, 2003, plaintiff Koonce contracted the flu and missed some workdays for which she provided a doctor's note.

77. On January 6, 2004, plaintiff Koonce returned to work from her Christmas vacation to find Kathleen Grip, a Caucasian, sitting at her desk.

78. On January 20, 2004, Johnson terminated Plaintiff Koonce without legitimate, non-discriminatory reasons.

**f) Bryant Moore**

79. Plaintiff Bryant Moore was employed as a driver at Camp LaGuardia from April 7, 2003, through July 14, 2004.

80. Plaintiff Gibson was plaintiff B. Moore's supervisor.

81. In January 2004, after plaintiff Gibson's termination, Nelson Colon [hereinafter "Colon"] became plaintiff B. Moore's supervisor.

82. Shortly thereafter, Hugh Sonner [hereinafter "Sonner"], a white male employed as a driver, was at fault in a "hit-and-run" accident that he reported to supervisor Colon.

83. Despite the facts that Sonner struck a client with a vehicle and failed to report this, Colon never disciplined him and failed to report the incident to his superior, as he did when plaintiff B. Moore had an accident.

84. Freddie Oh [hereinafter "Oh"], an Asian male driver employed by Camp LaGuardia, ran the company van into a power box, causing the entire camp to lose electricity in July 2003. VOA administration never punished Oh for this reckless conduct.

85. Indeed, in August 2003, after Oh's accident, VOA administrators selected him for a job in the laundry room, for which plaintiff B. Moore applied and was better qualified.

86. In October or November 2003, plaintiff B. Moore applied for a maintenance position. VOA administrators denied Moore this position and told him it was not available; in fact, Moore later learned that an unqualified individual was given the maintenance position.

87. In January 2004, plaintiff B. Moore applied for the position of senior driver; VOA advised him that he was one of two people qualified for the job.

88. VOA gave Colon the senior driver position, and no VOA manager interviewed plaintiff B. Moore for the position.

89. In February 2004, plaintiff B. Moore applied for the "driver in roving" position.

90. The interviewer for the "driver in roving" position told plaintiff B. Moore that he was the most qualified person for the job.

91. Plaintiff B. Moore did not receive an offer for the position of "driver in roving."

92. In or around March 2004, plaintiff B. Moore received notification that he was "not qualified" for the position of client care worker.

93. In March 2004, supervisor Colon was driving a van filled with clients that was hit by another VOA van driven by Kevin Cox who, while not qualified nor authorized to drive, was permitted to do so by Colon.

94. Supervisor Colon failed to seek medical treatment for clients injured in the accident in which he was involved.

95. Supervisor Colon failed to report to his supervisors an accident in which he was the driver.

96. It was company policy to report all accidents to the village police, as well as to the supervisor at Camp LaGuardia.

97. Despite Colon's failure to comply with company policy, Colon, who is not African-American, was not sanctioned.

98. On June 31 or July 1, 2004, plaintiff B. Moore misjudged a turn and hit a vehicle illegally parked in a fire lane.

99. Plaintiff B. Moore notified Colon about the aforementioned accident; Colon then notified the Village of Chester Police Department.

100. Plaintiff B. Moore took vacation time beginning on July 5, 2004.  While Moore was on vacation, supervisor Colon traveled to Moore's home to advise him that he would probably be terminated as a result of the July 1 accident.

101. Plaintiff B. Moore had merely one other incident concerning the vehicle he drove.

102.  Plaintiff B. Moore was terminated on July 14, 2004, outside the building, in front of those then on duty in his department.  This deviated from the manner in which personnel actions were generally taken, in a private meeting with an employee's supervisor.

### g)  William Oliphant

103. Plaintiff William Oliphant was employed as an assistant team leader in November 1999.  He worked in this position for about ten months and was then promoted to a counselor position.

104. Plaintiff W. Oliphant has a Bachelor's degree and has worked in social work for sixteen years.  He also worked as a drug and alcoholism counselor for three years before establishing a successful drug rehabilitation program and implementing a relapse prevention program at Camp LaGuardia in 2000.

105. In 2000, Don Moore [hereinafter "D. Moore"], a manager in human resources, hired a young white female with no education or experience in drug treatment or social work to supervise plaintiff W. Oliphant.

106. Before this hiring, D. Moore had not posted this position and plaintiff W. Oliphant was given no chance to apply for it.

107. After this new employee stated that she had completed a one-day course on the history of African-Americans and, from this, "knew all there was to know about those people," plaintiff W. Oliphant suggested to D. Moore that she be trained in racial sensitivity.

108. Plaintiff W. Oliphant complained to D. Moore regarding this employee's unsatisfactory conduct, but Moore took no action.

109. In the summer of 2002, plaintiff W. Oliphant was denied a position as a team leader in favor of Marybeth Seaman [hereinafter "Seaman"], a white female with little or no formal education and even less experience.

110. Plaintiff W. Oliphant was denied access to superordinates Brain, Peter Duda [hereinafter "Duda] and Lance Alexander [hereinafter "Alexander"], men who were more easily accessible to Caucasian employees at his level.

111. When granted access to Dyroff, plaintiff W. Oliphant made many recommendations to her regarding ways to improve the effectiveness of Camp LaGuardia and the SCIMS system. Dyroff rejected these recommendations with terse comment.

112. Seaman and Dyroff despised plaintiff W. Oliphant's intelligence and began devising ways to get rid of him.

113. In December 2003, Dyroff informed plaintiff W. Oliphant that clients were complaining about the way he was handling them.

114. In late 2003, plaintiff W. Oliphant was falsely accused of falsifying a log entry book in which employees were required to make entries indicating that they walked down a hallway or were at a certain location at a specific time.

115. In late 2003, Dyroff terminated plaintiff W. Oliphant for falsifying a log book. This basis was pretextual and masked racially discriminatory intent.

116. Plaintiff W. Oliphant was denied access to photo copiers and offices to which his white counterparts were not.

117. Plaintiff W. Oliphant was replaced by Alice Ellsworth [hereinafter "Ellsworth"], a severely underqualified white female who has since decimated the drug treatment program he had established and successfully managed.

118. Ellsworth was caught engaging in a sexual act with another staff member, yet was never reprimanded in any fashion, treatment dissimilar to that given to African-American employees.

**h) Pearl Oliphant**

119. Plaintiff Pearl Oliphant was hired as a team member effective November 1, 1999.

120. Plaintiff P. Oliphant was over-qualified for this entry-level position.

121. After plaintiff P. Oliphant indicated she could not work weekends due to family obligations, she was offered the position of assistant business manager.

122. Plaintiff P. Oliphant was supervised by a Caucasian who lacked basic competency to do her job.

123.   In April 2000, plaintiff P. Oliphant filed an EEO complaint against her supervisor.

124.   Thereafter, her supervisor referred to her as "You black ___"

125.   Thereafter, this supervisor was replaced by another Caucasian, and plaintiff P. Oliphant was demoted to the position of accounting clerk, with a pay cut.

126.   Defendant then hired a Caucasian, Joseph Lorenzo, as assistant business manager.

127.   In 2002, plaintiff P. Oliphant was terminated as part of an alleged downsizing.

128.   In fact, defendant refused to allow plaintiff P. Oliphant to fill or even compete for positions for which she was qualified, repeatedly denigrating and devaluing her on the basis of her race.

**i) Williams**

129.   In April 2002, plaintiff Elijah Williams accepted a promotional opportunity to serve as director of a mental health program at Camp LaGuardia funded by the New York State Office of Temporary and Disability Assistance.

130.   Before plaintiff Williams took this position, the title of the administrator of the grant, the position he was slated to take, was changed from director to assistant director.

131.   After plaintiff Williams accepted this position, the associate director of operations, Brian Bardell, consistently denied plaintiff Williams with basic support necessary to move furniture and files and to properly structure the area allocated for the mental health program.

132. The week plaintiff Williams started his new job, Lance Alexander was installed as the new division director, but Peter Duda, associate director of programs and the former acting division director, continued to be Williams' direct supervisor. Under Duda's direction, the mental health program almost doubled in size. In the summer of 2002, Duda accepted a position in the VOA's New York City division. Jeff Brain was then hired as associate director of programs. Almost immediately after he was installed, Brain demoralized plaintiff Williams' staff and decimated the program by reassigning members of the staff to different areas within the facility.

133. While serving as assistant program director, plaintiff Williams and members of the staff received several baseless write-ups which demonstrated racial hostility toward them.

134. When combined with the lack of professional support, these write-ups caused plaintiff Williams to suffer major depression and left him no option but to take leave.

135. Upon returning from the leave, plaintiff Williams was attending a meeting with the human resources manager, Ashley, when the associate director of operations, Bardell, walked in and referred to him as "Elijah Muhammad."

136. After plaintiff Williams took offense to this association, other senior administrators either denied hearing the remark or denied that it had any pejorative import.

137. Thereafter, plaintiff Williams was again stripped of resources, denied a position in federal grant-writing needed for mental health programs, and advised by Alexander that he was not qualified to work on such grants. A Caucasian female with no

experience was deemed qualified by Alexander, who subsequently told Williams to help her write a federal grant.

138. Eventually, plaintiff Williams filed a complaint with the acting CEO, Linda McNeil, seeking a serious investigation into the conditions to which he had been subjected by Alexander. Alexander investigated the complaint and subsequently exonerated himself. Plaintiff Williams complained to Ashley, protesting Alexander's self-evaluation. Williams told Ashley that he had the evidence necessary to prove that the racial discrimination at Camp LaGuardia was pervasive. Conditions then became so hostile that Williams was advised by his psychiatrist and social worker to resign in the interests of his health, and Williams agreed to being laid off. To date, VOA has taken no action based on his complaints.

**j) Wanda Loving**

139. Plaintiff Wanda Loving was employed as an assistant team leader from November 1999 through December 2003.

140. Plaintiff Loving applied for a better position, for which she was qualified. She was rejected without an interview.

141. Plaintiff Williams served as Loving's supervisor in the mental health grant program and highly rated her performance, yet Alexander forced Williams to downgrade her personal performance rating.

142. In or about December 2003, while being supervised by plaintiff Williams, Loving was advised that her unit was being dismantled. After Loving applied for another position, defendant's agents advised her that, because the mental health grant program

was being dismantled, she no longer worked for the agency and was not entitled to that job.

143. Plaintiff Loving was terminated without being given the opportunity [as was customary for Caucasian employees] to work in another, available position.

144. In addition, plaintiff Loving was denied a bonus though she had worked nearly all of 2003; supervisory personnel also subjected her to harassment, and Dyroff placed a false and adverse write-up in her file.

145. As a consequence of her termination, plaintiff Loving suffered an exacerbation of her depression and a loss of income.

### k) Natasha McCall

146. Plaintiff Natasha McCall was employed between April 2001 and December 2003.

147. Plaintiff Williams served as McCall's supervisor in the mental health grant program and highly rated her performance, yet Alexander forced Williams to downgrade her personal performance rating.

148. Plaintiff McCall requested promotional opportunities during her employment with VOA but was denied such opportunities in favor of less-qualified Caucasians.

149. In December 2003, plaintiff McCall was advised that her department was being dismantled, and she was laid off without severance pay, and was denied the bonus to which she was entitled.

150. Such treatment was uncustomary and represented racial hostility toward plaintiff McCall.

### l) Jorge Lao

151. Plaintiff Lao is of Puerto Rican descent and worked for ten years as a corrections officer and for more than ten years as a supervisor in the New York City Department of Corrections.

152. After being recruited by a nephew who then served as director of food services, Lao commenced working as a cook at Camp LaGuardia in 1999.

153. After his nephew departed the position, Michael Nicario, a white male, became food services manager.   Karen Comfort [hereinafter "Comfort"], another Caucasian, was his assistant.

154. In 2002, Nicario departed and Comfort was elevated to the position of food services manager.

155. In April 2002, plaintiff Lao then applied for the assistant food services manager's position; however, Comfort advised him that her girlfriend would be getting the position.

156. Thereafter, this female candidate was found lacking in basic qualifications for the position and withdrew.

157. Plaintiff Lao remained as the sole qualified candidate for the position; however, defendant refused to provide him the job, instead promoting an unqualified African-American, Willie Wade.

158. When plaintiff Lao confronted Comfort about his superior qualifications for the position, she advised him that she felt threatened by his credentials; he has a Bachelor's degree in Corrections Administration, an Associate's Degree in Applied Arts in Business Administration, and an AOS degree in the Culinary Arts as a professional chef.  Comfort has a GED.

**m) Charles Moore**

159.   Plaintiff Charles Moore spent approximately thirty years working as a boiler-room technician and maintenance supervisor for the New York City Housing Authority.

160.   In 1999, defendant hired plaintiff C. Moore as a Maintenance III-Boiler Operator/Technician.

161.   In 2002, plaintiff C. Moore sought promotion to a Maintenance IV position, for which he qualified.   He was twice denied this position, to which a less-qualified Caucasian, Mike Davidson, was assigned. Davidson didn't have either a high school diploma or a GED, which were required of all employees, although only minority employees were expected to comply with this requirement. Associate Director of Operations Bardell assisted Davidson in getting the position by falsifying parts of his resume.

162.   In 2003, plaintiff C. Moore sought promotion to the position of environmental manager, another position for which he qualified.   When a less-qualified Caucasian, Wayne Hampel, applied for the position, plaintiff Moore was told to "take a back seat with [his] paperwork" to give Hampel a chance at the job. When Moore applied again, he was told that the office in New York City never got his paperwork. He was later told that VOA was hiring a less-qualified Caucasian, James Mahoney.

163.   Plaintiff C. Moore has routinely been denied overtime, which has gone to part-time Caucasian employees earning nearly $10.00 more per hour than he does.

164.   While these part-time employees have received overtime, significantly enhancing their earnings, plaintiff C. Moore has not received a pay increase in several

years and is no longer given the opportunity to work overtime. Moore earns $8 to $9 per hour less in straight-time pay than part-timers earn in straight-time pay and earns approximately $20 less per hour when the part-time engineers are making overtime, yet he is expected to work harder, doing everything the part-timers do and more. Plaintiff C. Moore is expected to help the maintenance crew in passing periodic Callahan inspections, ensuring that the facility is clean and well-maintained, yet he receives no adjustment in his personal performance plan rating or annual bonus.

165. Plaintiff C. Moore has repeatedly been subjected to demeaning treatment and intolerable working conditions based on his race.

166. Plaintiff C. Moore has also been subjected to numerous changes of schedule for the convenience of his white part-time colleagues.

**n) Lynch**

167. Plaintiff Burthon Lynch was hired in 1999 as a Maintenance III worker. Although this was not a managerial position, Lynch was tasked by then-assistant environmental manager George Bory with supervising the entire maintenance crew. Bory, a Caucasian, repeatedly harassed and degraded plaintiff Lynch based on his race and humiliated him in front of the crew.

168. Bory made unwarranted disciplinary reports to the then-environmental manager, Eric Hammond, falsely accusing plaintiff Lynch of habitual tardiness and of intimidating the crew. Bory also demoralized Lynch by taking him out of the maintenance department and assigning him to mow the grounds, even though a full-time groundskeeper was already tasked with performing that job.

169. Before Bory was fired in 2001 for violating VOA's conflict-of-interest policy, he required Lynch to maintain an entire building by himself, while the eleven other crew members were assigned to work together to maintain the other building. Plaintiff Lynch was also tasked with inspecting the other crew members' work to make sure it was done properly.

170. In 2002, plaintiff Lynch sought lateral transfer [for job advancement and promotional opportunities] into the boiler room/maintenance area for a Maintenance III position that was posted in the department.

171. Human Resources Manager Ashley removed the position posting from the bulletin board and told plaintiff Lynch that the position wasn't yet available. Ashley then interviewed three Local 30 members, as well as two unqualified Caucasians, Kevin Cox and William Smith, both of whom were Maintenance II employees supervised by Lynch. None of these applicants was found to have the necessary qualifications for the job.

172. Bardell later interviewed plaintiff Lynch for the position and told him that, although he had "interviewed very well," he was "not the man for the job." Bory had told Bardell not to transfer Lynch because Bory didn't like minorities and consistently gave Caucasians preferential treatment. Another unqualified Caucasian, David Feller, a former Camp LaGuardia client, was coached and rapidly promoted to progress through the system in order to qualify him for a Maintenance III position, because he had done work on Bardell's house. Bardell was told that if Lynch wasn't transferred to the boiler room, Feller couldn't get the position because only two Maintenance III positions were available in the maintenance department. Plaintiff Lynch didn't receive the transfer until late in 2002, after Bardell had passed him over again and again to interview other

candidates, and after other maintenance engineers in the department circulated a petition highly recommending him for the job.

173. Plaintiff Lynch has been subjected to much lower wages than part-time Caucasian employees and has been caused on a day-to-day basis to adjust his schedule to accommodate the schedules of these Caucasian employees.

174. While these part-time employees have received overtime, significantly enhancing their earnings, plaintiff Lynch has not received a pay increase in several years and is no longer given the opportunity to work overtime. Lynch earns $8 to $9 per hour less in straight-time pay than part-timers earn in straight-time pay and earns approximately $20 less per hour when the part-time engineers are making overtime, yet he is expected to work harder, doing everything the part-timers do and more. Plaintiff Lynch is called out of the boiler room to supervise the maintenance crew in passing periodic Callahan inspections, ensuring that the facility is clean and well-maintained, yet he receives no adjustment in his personal performance plan rating or annual bonus. He was given a 1.8 rating while the less-competent Caucasian part-timers he supervised were given 2.3 and above.

175. By and through the intentionally discriminatory conduct set forth above, each plaintiff has been injured, to wit, loss of income and job benefits; each has suffered non-pecuniary loss, mental pain and suffering, anxiety, humiliation, embarrassment, and loss of opportunities on the basis of race and national origin.

176. Plaintiffs have been unable to find comparable employment, and in light of the job references each has and is likely to receive from defendant, shall likely continue to be unable to find comparable employment in the future.

## IV. **CAUSES OF ACTION**

177. Plaintiffs incorporate paras. 1-176 as if fully re-written herein.

178. By failing to promote plaintiff Anderson to the position of client care worker, defendant violated her right to be treated in a manner afforded to Caucasian employees in violation of 42 U.S.C. sec. 1981-a.

179. By terminating plaintiff Edwards based on his race, defendant violated his right to equal treatment in violation of 42 U.S.C. sec. 1981-a.

180. By terminating plaintiff Gibson on the basis of his race, defendant violated his rights under 42 sec. 1981-a.

181. By terminating plaintiff Ibrahim based on her race, denying her a promotion and treating her in a disparate manner compared with less-qualified Caucasians, defendant violated her rights under 42 sec. 1981-a.

182. By terminating plaintiff William Oliphant based on his race, defendant violated 42 sec. 1981-a.

183. By failing to promote plaintiff Pearl Oliphant based on her race and by then terminating her employment on the same basis, defendant violated 42 U.S.C. sec. 1981-a.

184. By treating plaintiff Koonce, an African-American, in a disparate manner from Tracey Johnson, a white female, and subsequently terminating plaintiff Koonce based on her race, defendant violated 42 sec. 1981-a.

185. By terminating plaintiffs Bryant Moore, Williams, Loving and McCall and by failing to promote plaintiff Lao, defendant discriminated against each on the basis of race or national origin in violation of 42 U.S.C. sec. 1981-a.

186.  By failing to promote plaintiff Charles Moore and by treating plaintiffs Charles Moore and Lynch in a disparate manner compared with less-qualified Caucasians, and by paying both these plaintiffs much less than part-time white workers doing the same tasks, defendant discriminated against each on the basis of race in violation of 42 U.S.C. sec. 1981-a.

187.  By engaging in the discriminatory acts and omissions set forth in paragraphs 178-186, defendant violated the rights of each plaintiff as provided by section 296 of the Executive Law of the State of New York.  As these claims arise from the same nucleus of operative facts as the claims set forth in these paragraphs, this Court has jurisdiction over the state law claims pursuant to 28 U.S.C. sec. 1367.

V.  **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray that this Honorable Court:

a)  accept jurisdiction over this matter;

b)  empanel a jury to fairly decide each claim within its jurisdiction;

c)  award to each plaintiff whole relief, including front and back pay with pre- and post-judgment interest; reinstatement to his/her former position or to a position comparable to those from which s/he was discriminatorily terminated or to which s/he was denied promotion; compensatory relief for the adverse impacts the proscribed employment practices had on each plaintiff; and punitive damages to punish defendant for the serious and malicious transgressions of law it has committed;

d)  award to plaintiff counsel fees and reasonably incurred litigation costs pursuant to 42 U.S.C. sec. 1988 and related federal statutes and rules and

e) enter any other order it deems required in the interests of justice and equity and consistent with the evidence and the law.

RESPECTFULLY SUBMITTED,

Michael H. Sussman (3497)

Law Office of Michael H. Sussman

P.O. Box 1005

Goshen, NY 10924

(845)-294-3991